2026 IL App (1st) 231821-U

No. 1-23-1821

First Division
August 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02 CR 02148 |
| JONATHAN COLEMAN, | ) ) | |
| Defendant-Appellant. | ) ) ) ) | Honorable Michael R. Clancy, Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The resentencing court improperly considered in aggravation an element inherent in the offense of first degree murder, and therefore, we vacate defendant's sentence and remand for a new sentencing hearing.

¶ 2    Following a jury trial, defendant-appellant Jonathan Coleman, who was 16 years old at the time of the offense, was found guilty of first degree murder and personally discharging a firearm resulting in Ricardo Cabrales's death and was sentenced to an aggregate term of 65 years in prison.

During postconviction proceedings, the State agreed that defendant's sentence violated *Miller v. Alabama*, 567 U.S. 460 (2012), and the trial court ordered a new sentencing hearing, after which defendant was resentenced to 35 years' imprisonment. Defendant appeals from the trial court's resentencing decision, arguing that the court improperly considered an element implicit in the offense and a fact not supported by the evidence in aggravation to increase defendant's sentence, and the court misapplied the *Miller* sentencing factors and gave deterrence undue weight in aggravation. For the reasons that follow, we vacate the sentence and remand for a new sentencing hearing.[1]

¶ 3                                                I. BACKGROUND

¶ 4     Defendant, along with his codefendant and older brother, Joshua Coleman, was charged with first degree murder for the December 20, 2001, shooting death of Cabrales. The Colemans' cases were severed, and a dual jury trial was held where defendant and his brother had separate juries.

¶ 5     Prior to trial, defendant filed a motion to suppress statements defendant allegedly made to law enforcement after voluntarily arriving at the police station. Following a hearing, the court denied defendant's motion, finding that the State met its burden of proof that defendant's statements were voluntarily made.

¶ 6     The dual jury trial took place from December 9 to December 16, 2004. We provide a brief summary of the evidence presented at trial.

---

[1] The parties completed briefing in this appeal in September 2025. However, the original authoring justice's illness delayed resolution of this appeal. The case was reassigned to accelerate resolution of this matter.

¶ 7 The shooting at issue occurred in an alley between South Ewing Avenue and Avenue J and between 97th and 98th Streets. Multiple witnesses testified that, at that time, the Latin Kings were the predominant gang in that neighborhood, defendant was a Latin King, and Cabrales was a Latin Dragon. Eyewitnesses testified that Cabrales was outside his home fixing his car on the day of the shooting and, at some point, he walked to a nearby used car dealership to get a bottle of radiator repair fluid. Less than 30 seconds after Cabrales left the dealership, the owner heard "four or five shots, really fast" coming from the alleyway. Another eyewitness testified that he heard multiple gunshots coming from the alley and, immediately afterwards, observed a 4-door maroon car speed through the alley. After the gunshots, eyewitnesses observed Cabrales laying down in the grass in front of 9708 South Avenue J and he was not moving.

¶ 8 Detective Steven Lazzara and his partner, Detective Thomas Ayers, were assigned to investigate Cabrales's shooting. Detective Lazzara testified that, upon arrival on the scene, he observed the deceased victim lying on the grass with "apparent gunshot wounds to his chest." Near the victim was a permanent marker, a set of car keys, and a bottle of radiator repair fluid. No firearms evidence was recovered from the area, but blood droplets were observed in the gangway between the alley and the front of 9708 South Avenue J.

¶ 9 The medical examiner who conducted the victim's autopsy testified that he died of multiple gunshot wounds. Cabrales's body had two gunshot entry wounds on his chest with no exit wounds and one gunshot wound with entry and exit above the left elbow and a reentry wound on the left side of the chest. Bullets were recovered from Cabrales's chest cavity. There was no evidence of "close-range firing."

¶ 10 The detectives interviewed Mallory Esquivel and Gerard Rodriguez that day. The detectives showed Rodriquez a photo array, and he identified defendant as the person who shot at

Cabrales. Two days later, Rodriguez and Esquivel separately viewed a lineup at the police station. Rodriguez again identified defendant as the shooter from the car. Esquivel identified defendant as the person sitting in the back seat of the car and his brother as the driver of the car. Rodriguez and Esquivel were both called as eyewitnesses at trial, but were evasive with their answers, could not recall their statements to police or their testimony before the grand jury, and testified that they only identified defendant as someone they knew. The prosecutor read their testimony from the grand jury transcripts. Rodriguez testified before the grand jury that, at the time of the shooting, he heard gunshots and then saw a maroon car with the barrel of a gun sticking out of the rear window in the alley and Cabrales trying to run away. He also admitted that he testified before the grand jury that he recognized defendant as the person in the backseat of the maroon car. Esquivel testified before the grand jury that, on the day of the shooting, she was at 99th Street and Ewing Avenue, she recognized defendant's red car traveling fast in the alley, and she observed defendant in the backseat and his brother and a girl in the front seats of the car.

¶ 11 On December 22, the detectives went to the Coleman residence, arrested defendant's brother, and brought him, along with his girlfriend, Tina, to the police station. Defendant's father, Terry Coleman, brought defendant to the police station that same day. The detectives questioned defendant several times that day. Detective Lazzara testified to the contents of the oral statement defendant provided around 5 p.m. that day.

¶ 12 Defendant stated to the detectives that, on the day of the shooting, he was driving around with his brother and Tina. He was in the backseat and his brother was driving. As they were driving on Avenue J, they saw Cabrales's car with the hood up. Defendant instructed his brother to go to Avenue M so that they could get a gun to shoot Cabrales. Near 96th Street and Avenue M, defendant found some Latin Kings and asked for a gun. After getting the gun, they returned to

Avenue J where they saw Cabrales's car. They did not see Cabrales, but when they drove into the alley by Avenue J, they saw Cabrales speaking with Rodriguez, also known as "Lucky," who defendant knew to be a Latin King. Defendant's brother stopped the car about two or three feet away from Cabrales, and defendant pointed a rifle out of the rear window and fired three or four times at Cabrales. Defendant stated that Cabrales was surprised by the gunshots and ran through a gangway. Defendant's brother drove southbound through the alley, and then they returned the rifle. Detective Lazzara testified that neither the rifle nor the car defendant's brother was driving were ever located.

¶ 13    The jury found defendant guilty of first degree murder and of personally discharging the firearm that killed Cabrales. On January 12, 2005, defendant filed a motion for a new trial, which the court denied on January 25, 2005.

¶ 14    Defendant's first sentencing hearing took place on January 25, 2005. The State entered into evidence defendant's "two publishable" findings of delinquency as to burglary and aggravated unlawful use of weapon, both in 2000. Defendant's presentencing investigation (PSI) report was submitted to the court. The report stated that defendant described his childhood as "good" and he was disciplined by his parents but "did not receive beatings." Defendant was enrolled at Washington High School but transferred to Sullivan House Alternative High School due to threats and harassment from local gang members who were trying to recruit him. Defendant presented four witnesses in mitigation: Father John Calicott; Jaqueline Love, a program director for the Delinquency Prevention Program at Sullivan House; Patricia Robinson, defendant's aunt, and Terry Coleman, defendant's father. Father Calicott and Love testified that they never had any problems with defendant and his father and aunt testified that he was helpful and respectful.

¶ 15    The trial court sentenced defendant to 40 years' imprisonment, plus 25 years for firearm enhancement, for an aggregate prison term of 65 years. On the same day, defendant filed a motion to reconsider the sentence, which the court denied on February 2, 2005.

¶ 16    On direct appeal, defendant raised challenges to Esquivel's grand jury testimony, his inculpatory statement, and issues of fines and fees. This court affirmed defendant's conviction and sentence. *People v. Coleman*, 271 Ill. App. 3d 1201 (2007) (unpublished Rule 23 order).

¶ 17    On November 10, 2008, defendant filed a *pro se* postconviction petition, alleging 11 claims of error. On January 28, 2009, the trial court summarily dismissed the petition. This court affirmed the dismissal. *People v. Coleman*, 2011 IL App (1st) 091005.

¶ 18    On April 17, 2015, defendant filed a *pro se* motion for leave to file a successive postconviction petition, challenging the constitutionality of his sentence. On July 27, 2016, the court advanced the petition to second-stage proceedings and appointed the public defender to represent defendant. Further proceedings on the petition were then delayed for an extended period of time as the parties awaited a ruling from the Illinois Supreme Court in *People v. Buffer*, 2019 IL 122327. On March 4, 2021, defense counsel filed a supplemental petition. On September 27, 2021, the State agreed that defendant's sentence should be vacated pursuant to *Miller* and he should be granted a new sentencing hearing, on the condition that defendant withdrew all other claims with respect to resentencing. On February 14, 2022, the court entered an agreed order to that effect.

¶ 19    The resentencing hearing occurred on August 23, 2023, and September 29, 2023. At the hearing, a new PSI report, defendant's Illinois Department of Corrections disciplinary records, a re-entry plan, and a comprehensive mitigation report were admitted into evidence. The parties also stipulated to the evidence presented at the trial and the prior sentencing hearing.

¶ 20    Defendant's disciplinary records showed that he only had six minor disciplinary incidents in 12 years. Defendant's last infraction occurred in 2011 at the age of 25, and he officially extricated himself from the Latin Kings by 2016.

¶ 21    Defendant hired a mitigation specialist, Jessica Carrier, and her 79-page mitigation report, stated that its purpose was to address defendant's "culpability within the framework of the [*Miller*] mitigating factors[,] *** including exposure to abuse, criminality, and violence in his family and in his community, mitigating circumstances surrounding the offense, his ability to meaningfully participate in his defense, and evidence of his capacity for change, such as evidence of his growth and rehabilitation since his incarceration." The report explained that, despite the fact that defendant was raised in a stable, intact family and was taught to be responsible, productive, and care for his family members, he was still exposed to many risk factors at home and in his neighborhood and reported six out of ten adverse childhood experiences ("ACEs") (sexual and physical abuse, his mother was physically abused, his mother suffered from mental health concerns, exposure to drugs and alcohol, and incarcerated family members). The report documented defendant's life history in great detail and concluded that defendant should receive a "lesser sentence" because his "conduct does not reflect irreparable corruption or that he has such irretrievable depravity that rehabilitation is impossible[.]"

¶ 22    The new PSI report indicated that defendant had two juvenile adjudications in 2000 for burglary and unlawful use of a weapon. Regarding the shooting, defendant relayed that Cabrales had previously made threats towards his sister and, on the day of the incident, Cabrales had chased his sister in his car. Defendant stated that no planning went into the offense and he "saw red" when he saw the victim's car. As to his family history, defendant stated that he was "blessed" to have a two-parent household, but he recognized that his father's discipline with extension cords, paddles,

and belts was considered physical abuse. He cited his uncle, who was involved in gang activity, as the only negative influence in his family. Defendant indicated that he wanted to obtain his GED and commercial driver's license. He reported having the support of his family, as well as his wife. Finally, defendant reported completing a bible study program, two parts of the GED program, a hospice program, and substance abuse classes.

¶ 23    Defendant presented two witnesses: Walter Taylor, defendant's middle school teacher, and Vanessa Coleman, defendant's wife.

¶ 24    Taylor testified that he was employed as the director for personal development at Chicago Teachers Union Foundation and, 23 years prior, he was defendant's middle school teacher. He recalled defendant as "a very kind, caring, loving child" and a "helpful student." Defendant also oftentimes walked Taylor to his bus stop after school.

¶ 25    Vanessa testified that she has known defendant since they were teenagers and they were married on July 24, 2019. She testified that she has made arrangements to provide defendant with whatever he needs to reintegrate into society upon his release, including employment as a tow truck driver. She further testified that defendant has "grown a lot" during his incarceration.

¶ 26    Defendant addressed the court in allocution, stating that he has realized the severity and magnitude of his mistakes and he continues to grow and mature as a person. He apologized to the victim's family for their loss and requested that the court give him "a second chance at life."

¶ 27    On October 2, 2023, the court sentenced defendant to 35 years in prison for first degree murder and declined to impose the now discretionary firearm enhancement. In so ruling, the court first set forth the reason for defendant's resentencing and explained the post-*Miller* principles of law regarding juvenile sentencing. The court expressly identified the *Miller* factors to be considered at sentencing. The court also acknowledged that, pursuant to the amended parole statute

in effect, defendant would be eligible for parole regardless of the new sentence because he had already served more than 20 years of his sentence. The court then provided an extensive summary of the evidence presented supporting each factor. Finally, the court expressly addressed each factor that it considered in determining defendant's sentence:

"Having considered the evidence at trial, the two presentence investigations, the history and character of the defendant, the evidence and arguments presented in mitigation, Mr. Coleman's statement during his right of elocution [*sic*], I find the following factors relevant to this case.

In aggravation, factors weighing in favor of imposing a term of imprisonment or to impose a more severe sentence, clearly he caused serious harm. He caused the death of Ricardo Cabrales.

The defendant has a history of delinquent activity: 2000 burglary and aggravated unlawful use of a weapon.

My sentence is imposed to deter others. My sentence also is considering the defendant's gang involvement. He was a Latin King prior to and after the shooting. He continued to be a member of the Latin King gang what's called the first ten years of his sentence in the Illinois Department of Corrections. He has subsequently left the gang in the last ten years or so.

In aggravation[,] I also considered his degree of participation, his specific role. He was the shooter. Upon seeing the victim, he went and obtained a weapon. When returning to the location *** where the victim was, unable to find him, he searched out that unarmed victim and found him. Upon finding him, he *** fired and struck the victim multiple times with gunshots. That included when the unarmed victim was fleeing from the defendant.

In mitigation, that being factors in mitigation weighing in favor of minimizing a sentence of imprisonment, I considered the defendant's age at the time of the offense, which was 16 years of age. He was a juvenile. I considered his youth and the attendant characteristics of being a juvenile. I find that his level of maturity in 2001 was an immature individual.

I don't find that the defendant is permanently incorrigible.

I find that he has the support of family. That could be considered in aggravation. Often times [*sic*][,] the State argues here the person had all the breaks in his life[,] but he still chose a path of crime. I do find he has support of an intact family that has issues, significant ones, but I do consider the support of family in mitigation, particularly as it may increase his likely potential to be successfully rehabilitated. He has the support of his wife, support of family members, support of individuals who have come here to court on numerous court occasions.

In mitigation[,] I consider his intellectual challenges and difficulty in school, including reading comprehension.

I considered the defendant is no longer gang involved and he has fewer recent disciplinary issues in the Illinois Department of Corrections.

I considered his remorsefulness presented during his elocution [*sic*]. I believe that's a reflection of the defendant's current character and attitude.

\*\*\*

In considering the seriousness of the offense and also the objective of restoring the offender to useful citizenship, the defendant is resentenced \*\*\* to 35 years in the Illinois

Department of Corrections. He will be given 21 years and 288 days credit for time in custody; time considered served[,] time actually served."

¶ 28　On the same day, defendant filed a motion to reconsider the sentence, arguing that the sentence was excessive and the court improperly considered factors in aggravation that are inherent in the offense. The court denied the motion.

¶ 29　This timely appeal followed.

¶ 30　　　　　　　　　　　　　　II. ANALYSIS

¶ 31　On appeal, defendant argues that the trial court improperly considered an element implicit in the offense and a fact not supported by the evidence in aggravation to increase defendant's sentence, and the trial court misapplied the *Miller* sentencing factors and gave deterrence undue weight in aggravation.

¶ 32　The Illinois Constitution requires that a sentence achieve a balance between the seriousness of the offense and the defendant's rehabilitative potential. *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008) (citing Ill. Const. 1970, art. I, § 11). Where a sentence is within the applicable statutory range, it will not be considered excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Notably, the seriousness of the offense is one of the most important factors for the court to consider. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). When a sentence falls within statutory guidelines, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. It will only be considered excessive if it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210.

¶ 33    In sentencing a defendant who was a juvenile at the time of the offense, section 5-4.5-105(a) of the Unified Code of Corrections (Code) requires that the sentencing court consider the following twelve factors in mitigation:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, domestic or sexual violence, sexual exploitation, physical abuse, or other childhood trauma including adverse childhood experiences (or ACEs);

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history;

(9) the person's involvement in the child welfare system;

(10) involvement of the person in the community;

(11) if a comprehensive mental health evaluation of the person was conducted by a qualified mental health professional, the outcome of the evaluation; and

(12) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2022).

¶ 34 These factors are to be considered in addition to the general statutory factors set forth in section 5-5-3.1(a) (730 ILCS 5/5-5-3.1 (West 2024)) and section 5-5-3.2(a) (730 ILCS 5/5-5-3.2(a) (West 2024)) of the Code. See 730 ILCS 5/5-4.5-105(a) ("the following additional factors in mitigation" should be considered by the court in determining an appropriate sentence for a person under 18 years of age at the time of the offense); *People v. Reyes*, 2025 IL App (2d) 210423-B, ¶ 41 (the legislature intended the potential mitigating factors for juveniles to be considered in addition to the general statutory mitigating and aggravating factors).

¶ 35 We give great deference to the trial court as it has discretionary powers in imposing a sentence. *Stacey*, 193 Ill. 2d at 209. This deference is owed "because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Thus, we will not disturb the sentencing decision absent an abuse of discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005).

¶ 36 However, whether the trial court relied upon improper sentencing factors is a question that we review *de novo*. *Reyes*, 2025 IL App (2d) 210423-B, ¶ 37. "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 37    Defendant's first contention on appeal is that the resentencing court impermissibly considered an element inherent in the offense, namely that death resulted from defendant's actions where he was convicted of first degree murder. Thus, our review is *de novo*. See *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008) (whether the sentencing court "erroneously subjected [the] defendant to double enhancement" is a question of law to be reviewed *de novo*).

¶ 38    Our supreme court has aptly explained the principle that an element inherent in the offense cannot be considered as aggravating in imposing a sentence as follows:

> "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' [Citation.] Such dual use of a single factor is often referred to as a 'double enhancement.' [Citation.] The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004).

¶ 39    The defendant bears the burden of affirmatively demonstrating that the sentencing court considered an improper factor. *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 52. "Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). "However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *Id.*

¶ 40 In the instant case, defendant was convicted of first degree murder, which necessarily includes as an element that he caused death. See 720 ILCS 5/9-1(a) (West 2024). Notably, the sentencing range for first degree murder is 20 years to natural life in prison (730 ILCS 5/5-4.5-20(a) (West 2024)), and defendant was ultimately resentenced to 35 years in prison, 15 years above the minimum sentence. One of the general statutory grounds the court may consider in aggravation is "the defendant's conduct caused or threatened serious harm[.]" 730 ILCS 5/5-5-3.2(a)(1). Defendant is, thus, correct that the sentencing court could not consider the death of the victim as an aggravating factor in fashioning his sentence, because death was a factor already taken into account by the legislature in determining the appropriate sentencing range for first degree murder. See *People v. Murry*, 2025 IL App (1st) 221202, ¶ 130 ("in a murder case, death cannot serve double duty, as both the crime and aggravation"). Upon our review of the record, we conclude that the resentencing court in this case improperly considered Cabrales's death as an aggravating factor and committed reversible error.

¶ 41 At the resentencing hearing, the court summarized and explained in great detail the evidence presented at the hearing and the relevance of that evidence to each statutory factor. The court then transitioned into expressly stating which factors it considered in determining defendant's 35-year sentence. Specifically, the court stated:

> "Having considered the evidence at trial, the two presentence investigations, the history and character of the defendant, the evidence and arguments presented in mitigation, Mr. Coleman's statement during his right of elocution [*sic*], I find the following factors relevant to this case.

> In aggravation, factors weighing in favor of imposing a term of imprisonment or to impose a more severe sentence, clearly he caused serious harm. He caused the death of Ricardo Cabrales."

¶ 42    The court explicitly stated that defendant caused serious harm and caused the victim's death which was a factor weighing in favor of a more severe sentence. We cannot parse the court's statement any other way. We have also reviewed the entirety of the court's sentencing comments, and nothing remediates the court's clear statement that it considered the victim's death in aggravation. See *People v. Williams*, 2019 IL App (1st) 173131, ¶ 24 (the entire record should be considered rather than just a few words or statement made by the sentencing court). Although the resentencing court referenced other factors in aggravation that could conceivably support the imposition of a 35-year sentence, on the record before us, we cannot say that the weight placed upon the fact that defendant caused Cabrales's death was "negligible." See *Murry*, 2025 IL App (1st) 221202, ¶¶ 134-35 (finding error where the trial court specifically stated that it considered the victim's death as a statutory aggravating factor and that "express consideration gave the death an undue legal significance in the sentencing analysis"); *People v. Whitney*, 297 Ill. App. 3d 965, 971 (1998) (remanded for resentencing where the sentencing court specifically stated on the record that it considered a nonexistent prior conviction in sentencing the defendant).

¶ 43    Additionally, defendant raised this error in his motion to reconsider his sentence, which was filed on the same day as the hearing, but the court did not specifically address or provide any clarification on this issue in denying the motion that day. See *People v. Malin,* 359 Ill. App. 3d 257, 264 (2005) (no remand necessary where, in ruling on the defendant's motion to reconsider, the sentencing court clarified that the only factor in aggravation it considered was the deterrent effect of the sentence). Had the trial court's intention been to emphasize that defendant, rather than

his brother, caused Cabrales's death, the motion to reconsider would have been an appropriate time to provide that clarity, but it did not do so. *Murry*, 2025 IL App (1st) 221202, ¶ 139 (stating that "[w]e must take *** the sentencing court at its word").

¶ 44 In its response brief, the State contends that defendant cannot demonstrate that the court increased his sentence based on the fact that a death occurred as a result of the crime in this case. In particular, the State asserts that the court "properly considered the nature and circumstances of the case" and "the comments [defendant] challenges were a necessary part of the circuit court's proper discussion of the nature, circumstances and context of the offense as a whole."

¶ 45 We acknowledge that "it is not impermissible for the sentencing court to consider the force employed and the physical manner in which the victim's death was brought about." *People v. Andrews*, 105 Ill. App. 3d 1109, 1113 (1982); *People v. Barney*, 111 Ill. App. 3d 669, 679 (1982) ("It is unrealistic to suggest that the judge sentencing a convicted murderer must avoid mentioning the fact that someone has died or risk committing reversible error"). Certainly, at other points in its oral ruling, the court provided a lengthy summation of the facts of the crime and specifically addressed the nature and circumstances of the offense, *e.g.*, defendant's participation in or planning of the shooting. See *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 36 (stating that "[t]rial courts are permitted to consider the nature and circumstances of the offense and the degree and gravity of [the defendant's] conduct"). However, the fact that the court discussed the context of the shooting *at other points* does not negate the court's express statement that Cabrales's death was a factor it considered in aggravation. The court's statement also cannot be characterized as merely a passing reference to the injuries caused by defendant's crime. See *People v. Dowding*, 388 Ill. App. 3d 936, 943-44 (2009) (finding error where the trial court "did not merely mention the

- 17 -

victim's death in its summary of the circumstances of the case or in stressing the seriousness of the offense").

¶ 46    The State also argues that, even if considered an improper factor, it was a harmless error. We disagree. The caselaw is clear on this point. Where the sentencing court relied on an improper factor, which it did, and the reviewing court cannot deduce exactly how much weight was given to that improper factor, which we cannot, remand is necessary. See *People v. Conover*, 84 Ill. 2d 400, 405 (1981); *Dowding*, 388 Ill. App. 3d at 946 (remand necessary where "the court neither over nor underemphasized its consideration of the improper factor" and it was unclear how much weight it was given).

¶ 47    Finally, defendant asserts that *People v. Joe*, 207 Ill. App. 3d 1079 (1991), is instructive here. There, the defendant was found guilty of first degree murder sentenced to 60 years in prison. *Id.* at 1080. On appeal, the defendant argued that the trial court relied on improper aggravating factors, including the victim's death. *Id.* at 1085. The court specifically stated: "The factors in aggravation that I will note are that you engaged in a course of conduct which threatened serious harm, indeed did cause serious harm to the victim." *Id.* at 1085-86. The Fifth District of this court concluded that this was an improper factor "since serious harm is inherent in the offense." *Id.* at 1086. The court stated that the error was compounded by the court's improper consideration of evidence not supported by the record and of the victim's status in the community. *Id.* at 1086-87. Just as in *Joe*, the court here expressly stated that it considered the victim's death as a factor in aggravation.

¶ 48    However, the State attempts to distinguish *Joe* because the court there considered other improper factors which compounded the error. We reject this particular distinction for the following reasons. Defendant's other arguments on appeal suggest that the trial court here also

improperly considered a fact not in evidence, namely that defendant fired shots "when the unarmed victim was fleeing from the defendant." Our review of the record shows that there was testimony at trial that Cabrales was shot and he fled, but it is not clear that defendant continued to shoot at Cabrales as he ran away, especially where none of the gunshots entered through his back. Thus, it is certainly arguable that the court misstated the facts in evidence. Additionally, defendant points out in his brief that the court considered a juvenile delinquency finding for aggravated unlawful use of a weapon, but his second PSI indicated that the finding was only for unlawful use of a weapon. The State admits that the record is not clear on which is accurate, and thus, it is possible that defendant's juvenile history was not accurately reported. Although these errors may not, on their own, have constituted reversible error, we are nonetheless reticent to conclude that the victim's death was the only improper consideration at resentencing. As such, clarity of these details may be appropriate on remand to ensure an error-free resentencing.

¶ 49                                              III. CONCLUSION

¶ 50     For the reasons stated, we vacate the judgment of the circuit court and remand for a new sentencing hearing.

¶ 51     Vacated and remanded.